People v Flores (2023 NY Slip Op 02768)

People v Flores

2023 NY Slip Op 02768

Decided on May 23, 2023

Appellate Division, First Department

MOULTON, J: 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 23, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
Cynthia S. Kern Ellen Gesmer Anil C. Singh Peter H. Moulton

Ind. No. 0140/14 Appeal No. 17508 17509 Case No. 2016-1358, 2016-1408, 2017-1194, 2017-1195 

[*1]The People of the State of New York, Respondent,
v
Felix Ojeda Flores, Defendant-Appellant.
The People of the State of New York, Respondent,
v
Orlando Carrera, Defendant-Appellant.

Defendants separately appeal from the order of the Supreme Court, Bronx County (John W. Carter, J.), entered on or about March 26, 2021, which denied each defendant's CPL 440.10 motion to vacate his judgment of conviction.

Caprice R. Jenerson, Office of Appellate Defender, New York (Sean Nuttall, Karena Rahall of counsel), and Clearly Gottlieb Steen & Hamilton, LLP, New York (Lev L. Dassin, Sela Brown and Laura Daugherty of counsel), for Felix Ojeda Flores, appellant.
Robert S. Dean, Center for Appellate Litigation, New York (Alexandra Mitter and Brittany N. Francis of counsel), for Orlando Carrera, appellant.
Darcel D. Clark, District Attorney, Bronx (Emily A. Aldridge, Peter D. Coddington and David M. Cohn of counsel), for Respondent.

MOULTON, J: 

Defendants appeal from judgments of Supreme Court, Bronx County which convicted them, after a jury trial, of a criminal sexual act in the first degree, assault in the third degree, and criminal possession of a weapon in the fourth degree. Defendants also appeal the denial of their CPL 440.10 motions to vacate the judgments.
The central issue in these appeals is whether the People violated Brady v Maryland (373 US 83 [1963]) by failing to disclose to the defense in discovery evidence that the Bronx District Attorney's Office (the DA), through its Crime Victims Assistance Unit (the CVAU), was helping the complainant (L.R.) obtain an immigration benefit known as a U visa.
The People inexplicably suppressed evidence of CVAU's assistance to complainant regarding the U visa. As discussed below, a jury could find that the U visa was an important benefit to the complainant  so important that it could potentially cause him to fabricate his testimony. The credibility of the complainant's testimony was crucial in determining the outcome of this case. We find that the U visa evidence withheld from the defense was material under Brady because there was a reasonable probability that it would have caused the jury to question the complainant's testimony, and thereby raise a reasonable doubt as to defendants' guilt.
Consequently, the Supreme Court's denial of defendants' CPL 440.10 motions should be reversed, and the judgments should be vacated. Given that defendants have already served their eight-year sentences and have been deported, the indictments should be dismissed under CPL 440.10(4) (see People v Wagstaffe, 120 AD3d 1361, 1364 [2d Dept 2014]), and as a matter of discretion in the interest of justice. The issues raised by defendants on the direct appeal are academic.
The Trial
Defendants were jointly tried before a jury beginning on July 21, 2015. At trial, the prosecution called L.R., Officer Santiago Inoa, and Dr. Danielle Weinman, a Montefiore Medical Center emergency room physician. The defense called a Legal Aid investigator who testified about the layout of the basement apartment where the incident occurred. Defendants did not testify.
L.R. testified that he began renting a room from [*2]defendant Orlando Carrera in Carrera's four-bedroom basement apartment approximately six months before the sexual assault. L.R. testified that Carrera's wife, their three-year old daughter, defendant Felix Ojeda Flores, and a man he knew as Rojo also lived in the apartment. L.R. testified that he was unemployed but received worker's compensation from a 2012 injury. According to L.R., he had only small, passing problems with his roommates in the six months between when he moved in and the attack on December 24, 2013.
L.R. testified that the events on December 24, 2013, occurred as follows: In the morning, he and Carrera went to a bank where L.R. withdrew money for rent and beer. L.R. gave the money to Carrera. Later, defendants and L.R. drank and sang karaoke together in the apartment. L.R. stated that he felt "buzzed" but not drunk.
While he and defendants were drinking together, Flores mentioned a prior argument that L.R. had with Rojo over the apartment cleaning schedule. Flores said that Rojo had calmed down, but that if the dispute had involved him, he would have hit L.R. Then, Flores stood up to hit L.R., prompting L.R. to tell him, "calm down. I don't want to fight." L.R. testified that Flores replied that if he didn't want to fight, then L.R. "should give him [his] ass." Carrera then interjected and suggested that L.R. and Flores could fight one to one. L.R. moved towards the hallway to "get out of the situation." L.R. had not realized that Carrera was behind him until Carrera struck the back of his knees with a stick, causing him to fall. He then testified in detail that defendants held him down, Flores crushed his skull into the ground, and both defendants anally raped him.
After the assault, L.R. went to the bathroom. When he emerged, the altercation continued briefly. He described defendants acting in concert to impede his exit from the apartment, with Flores standing in his way and Carrera throwing bottles and other kitchen items at him.[FN1] He testified that he retreated to his own room and tried, unsuccessfully, to call 911. Eventually L.R. was able to leave.
L.R. testified that the assault left him ashamed and afraid, and that he did not discuss what had happened with anyone for the next two days. He reported the assault to police on December 28, 2013.
L.R. testified that he began to experience a severe pain in his head on December 31, 2013. His aunt called an ambulance, which transported him to Montefiore Medical Center. At the hospital, L.R. told the hospital staff that he felt pain in his head, had problems with his anus, had been raped, and had contemplated suicide. L.R. further testified that he was hospitalized in August 2014 for suicidal thoughts as the result of "such anger that [he] had been raped by" defendants. He testified that he had not been hospitalized before, and he continues to seek psychiatric treatment.
As L.R. was the sole witness with actual knowledge of the relevant events, his credibility was at the center [*3]of the trial. The prosecution attempted to vitiate possible lines of impeachment, and the defense inquired on a variety of matters that could undermine his credibility. L.R. acknowledged on direct that he was convicted of driving while his ability was impaired in 2004 and of driving while intoxicated in 2007. In addition, he explained that in 2003 he hit a light post. Because he was scared to tell the police the truth, he told the police that his car was stolen, and he filed a police report. L.R. testified that he eventually told the police the truth because the police made him nervous.
During cross-examination, the defense questioned L.R. regarding this false police report (which resulted in his guilty plea for disorderly conduct), and his drunk driving convictions. They questioned him about inconsistencies in his testimony. Defense counsel asked L.R. about the pants he wore during the incident, which he kept for several months and eventually threw away. Defense counsel asked L.R. whether he told hospital workers that he ran screaming from the building after the sexual assault, but L.R. denied having done so.[FN2] L.R. also denied that Carrera told him to leave the apartment and denied having roommate problems. On cross-examination, L.R. denied threatening Carrera with a knife but admitted that he was drunk and that he apologized to Carrera just to keep things calm. L.R. denied that Carrera told him over a three-month span that L.R. drank too much, was too aggressive, and needed to calm down.
Defense counsel also cross-examined L.R. about retrieving his phone, his purported inability to call 911, and his remaining in his room for "a long time" after the attack until he left to buy water. L.R. confirmed that he voluntarily returned to the apartment after purchasing water even though his aunt lived nearby.
Next, the prosecution called Officer Inoa to testify. The Officer explained that on December 28, 2013, L.R. came into the precinct to tell him that he was raped by his roommates. The Officer could not recall if L.R. complained of, or showed him, any injuries. He could not recall whether he took any photographs.[FN3] After the prosecution refreshed his memory with an Aided Card (used to document injuries and indicate the refusal of medical attention), Officer Inoa testified that the "Victim was sexually abused and held down and bruised." He further testified that he went with L.R. to the apartment and arrested Carrera that day.[FN4] On cross-examination, the Officer testified that after he entered the apartment, L.R. pointed out Carrera and said that Carrera raped him, and then L.R. and Carrera began fighting over whether L.R. had paid rent.
The prosecution also called Dr. Danielle Weinman, who testified about L.R.'s medical records from his hospital visit on December 31, 2013. She was certified as an expert in emergency room medicine over defense counsels' objections. Dr. Weinman testified that the medical records stated that L.R. complained of headaches[*4], suicidal ideation, and bruising on his arms and legs. She testified that a physician's assistant had examined L.R. and found external hemorrhoids but no tears or abrasions on his rectum. She testified that lubrication would make tearing less likely and that L.R. reported that he was treating with hemorrhoid cream at the time of the rape. Dr. Weinman stated that not all rape victims exhibit tears on their anus, and that when "he said he was raped, [she] believed him" and, as a doctor, she "is not supposed to question a patient."
At the close of the prosecution's case, defense counsel jointly moved for an order of dismissal because L.R.'s testimony was "so unbelievable" that the case should not go to the jury and that the testimony was too vague to support the weapons possession charge. The court denied the motion.
The defense then presented their case, which consisted of testimony from a Legal Aid investigator. The investigator testified that the apartment had two exit doors, and a window in the bathroom that was large enough for a person to fit through. The court admitted several photographs of the apartment into evidence.
At the close of defendants' case, the court denied defense counsels' renewed motions for an order of dismissal.
In similar summations, defense counsel submitted that "this case [rose] and [fell] on [L.R.'s] testimony," and focused their summations on attacking L.R.'s credibility. Both defense counsel submitted that L.R. "can't be believed" and was a "troubled and disturbed person" with "a drinking problem." Counsel reminded the jury that L.R. filed a false police report. Counsel also argued that L.R.'s accusation was a lie that he fabricated because Carrera wanted him out of the apartment and because they had a rent dispute. Defense counsel pointed out that Dr. Weinman's testimony was nothing more than a statement of what L.R. had told hospital staff.
On summation, the prosecution argued to the jury that L.R. was credible and the level of detail in L.R.'s testimony bolstered his credibility. The prosecution told the jury that L.R. had no motive to lie and "[e]ven defense concedes there's no motive, can't find a motive." The prosecution argued that it makes "no sense" for L.R. to have "fabricated" this case over a rent dispute and asked the jury, "if he made this up about a rent dispute, then what benefit does [L.R.] get?"
The jury deliberated for two days. During deliberations, the jury sent the judge multiple notes. It asked to review L.R.'s entire direct examination, L.R.'s cross-examination by Flores's attorney, Officer Inoa's testimony, the photographs taken by the investigator, and L.R.'s medical records. The jury also requested that the judge re-read the charges against both defendants. On July 30, 2015, the jury found defendants guilty on all three charges.
By judgments of conviction dated December 17, 2015, each defendant was sentenced to 8 years imprisonment on the first-degree criminal sexual act (Penal Law [*5]§ 130.50[1]) followed by 10 years of post-release supervision. The sentences ran concurrently with the 1 year and 30 days jail sentences for the misdemeanor assault convictions (Penal Law § 120.00[1]) and weapons possession convictions (Penal Law § 265.01[2]). Defendants served their prison terms and were deported.
The FOIL Investigation and 440.10 Motions
By letter dated January 28, 2019, Carrera's appellate counsel submitted a FOIL request seeking, in connection with Carrera's prosecution, "the complete records of any and all assistance provided to any witness in the prosecution of Mr. Carrera by any unit within the Bronx District Attorney's office, including but not limited to the [CVAU]." Defense counsel also requested "any record of assistance having been outsourced to any other social work agency, psychological services provider, medical office, real estate agency, travel agency, or any other such relevant sources, or any records created by such agency." Additionally, counsel requested documentation of any relocation expenses paid by the CVAU and or any expenses paid by the DA. The prosecution responded to the FOIL request on December 16, 2019, by disclosing seven pages of redacted documents.
On May 8, 2020, each defendant filed a motion to vacate the judgment pursuant to CPLR 440.10. Defendants argued that the People violated their Brady obligations by failing to disclose that the DA provided a panoply of benefits to L.R. while the trial was pending. Carrera alternatively argued that the CVAU records constituted newly discovered evidence. Flores asserted that the undisclosed CVAU records constituted Rosario material.
While preparing opposition to defendants' 440 motions, the People realized that their FOIL response was incomplete. By correspondence dated October 7 and 16, 2020, the People disclosed an additional 18 pages of redacted CVAU records. On October 28, 2020, defendants filed supplemental papers addressing these records.
Crucially, the October 7, 2020 FOIL response included the CVAU records reflecting that the DA was providing L.R. with assistance in obtaining a U visa. The first explicit reference to that assistance appears on September 12, 2014 (10 months before trial). On that date, the records reflect that L.R. "wants the case to go to trial. Inquired about the U-visa" and "provided U-Visa info." The records reflect that on April 22, 2015, the CVAU "[p]rovided information for Immigration Services." They also reflect that on July 28, 2015, seven days after the trial commenced, "[w]e spoke regarding the U-Visa he said that he has begun the process with Catholic Charities." Then, on December 22, 2015, the CVAU records indicate "[s]poke to the client on follow-up, client informed me that he went to Catholic Charity seeking immigration help for the U-Visa, he informed me that they will not take his case due to the case being complicated due to immigration history" and "[p]rovided client Immigration lawyer information."
The [*6]People opposed defendants' 440 motions by papers dated December 1, 2020.
By decision entered March 26, 2021 (the 440 decision), Justice Carter of Supreme Court, Bronx County (the 440 court) denied defendants' respective motions without a hearing. The 440 court analyzed the materiality of the nondisclosed CVAU records under the "reasonable probability standard" because defense counsel failed to specifically request the CVAU records. The court observed that the records demonstrated that L.R. received counseling services and mental health referrals, but that was already known to defendants. The court also noted that no evidence indicated that either the CVAU or the Office of Victim Services (OVS), a state agency, paid for L.R.'s medical expenses and, in any event, defendants already knew that many medical bills indicated "no bill-no charge." The court rejected defendants' argument that CVAU obtained housing for L.R. because the CVAU only made a single phone call to an individual renting a room on Craig's List and referred L.R. to a shelter. The court also found that the People had disclosed all lunch and transportation expenses. None of these benefits, the court reasoned, would have affected the outcome of the trial had the jury known about them.
The 440 court further rejected defendants' argument that the People violated Brady by failing to disclose the U visa evidence and by providing L.R. with referrals for immigration assistance. The court pointed out that although a U visa application requires a certification from law enforcement, a "certification does not guarantee the issuance of the visa." In addition, the court pointed to the People's argument that the DA did not provide the certification to L.R. until after defendants were sentenced. Moreover, the 440 court held that there was no reasonable probability that the nondisclosure affected the verdict because even if L.R. hoped for a U visa in exchange for his cooperation, "there is no objective evidence of an agreement to that effect." The court further reasoned that counsel for defendants conducted "scathing" cross-examinations and, therefore, more impeaching evidence would not have changed the jury's verdict. The court rejected Carrera's newly discovered evidence claims and Flores's Rosario claims.
This Court granted Carrera's and Flores's motions for leave to appeal the denial of their CPL 440.10 motions and consolidated the CPL 440.10 appeals with the direct appeals.
U visa
A U visa is available to an alien who "has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity[,] . . . possesses information concerning criminal activity . . . [and] . . . has been helpful, is being helpful, or is likely to be helpful" to a Federal, State, or local law enforcement official, prosecutor, judge, or other authority prosecuting criminal activity (Victims of Trafficking and Violence Protection Act of 2000, 8 USC § 1101[a][15][U][i][I-III], as added by Pub[*7]. L. 106-386, 114 US Stat. 1464). The purpose of the statute is to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes . . . while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States" (id. at § 1513). A list of qualifying crimes is contained in Section 1101(a)(15)(U)(iii) of the Act.
To obtain a U visa from the United States Citizenship and Immigration Services, an applicant must first acquire a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity (see 8 USC § 1184 [p][1]). The certification must confirm that the applicant for a U visa "'has been helpful, is being helpful, or is likely to be helpful'" in the investigation or prosecution of criminal activity (id.). Without a certification, the applicant cannot obtain a U visa. Law enforcement is not mandated to issue the certification (see e.g. Orosco v Napolitano, 598 F3d 222 [5th Cir 2010]).
The U visa is a valuable benefit. Under Section 245(m) of the Act, after three years of continuous presence in the United States (in which the recipient also receives work authorization), the recipient may apply for lawful permanent residence in the United States.
In opposition to defendants' CPL 440.10 motions, the People submitted an affidavit (denominated as an affirmation) from the Director of the CVAU explaining the CVAU's role as it relates to U visas. In paragraph 14, the Director explained the following:
"When discussing services that CVAU can provide, advocates do not list U-visas among those services. There have been efforts to publicize the availability of the U-visa, including a campaign by the mayor's office to place posters promoting U-visas in MTA subways. Undocumented clients are usually aware of the existence of U-visas. Many of our clients have general immigration issues. We provide them with the names of agencies that assist with immigration and the U-visa if they are aware. CVAU explains that victims must cooperate with the prosecution in order to be considered for a U-visa. CVAU does not provide U-visa applications. The District Attorney's Office only certifies that a victim cooperated" (emphasis added).
The People also submitted an affirmation from the Assistant District Attorney who handled the case after arrest through grand jury, discovery, and pretrial proceedings. The ADA explained, among other things, that she "recall[ed] speaking to the complainant in passing regarding a U-visa; it was a very brief conversation. I referred him to the Crime Victims Assistance Unit for any additional advice they could offer regarding a U-visa." The affirmation does not clarify whether the CVAU referral was the initial referral. The CVAU records indicate that L.R. first met with the CVAU three days after [*8]reporting the crime.
The District Attorney Attorney's office provided L.R. with a certification in support of his U visa application on May 2, 2016, after defendants were sentenced. The record does not indicate whether L.R. was ultimately successful in obtaining the U visa.
Discussion
In Brady v Maryland (373 US 83 [1963]), the United States Supreme Court reversed a criminal conviction under the due process clause of Fourteenth Amendment of United States Constitution, holding that "[s]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution" (id. at 87). Nine years later, the United States Supreme Court extended the Brady rule to evidence affecting a witness's credibility (see Giglio v United States, 405 US 150, 154-155 [1972] [reversing the defendant's conviction as the result of the government's suppression of an agreement with its cooperating witness]).
The due process clause of the New York State Constitution, like the Constitution of the United States, guarantees "a criminal defendant the right to discover favorable evidence in the People's possession material to guilt or punishment" (People v Fuentes, 12 NY3d 259, 263 [2009]). Under New York law, the People have an obligation to disclose Brady evidence in their possession that is both favorable and material to the defense (see People v Vilardi, 76 NY2d 67, 73 [1990]). "Negligent, as well as deliberate, nondisclosure may deny due process" (People v Giuca, 33 NY3d 462, 473 [2019]). Because Brady is based on the concept that prosecutors "must deal fairly with the accused and be candid with the courts," even inadvertent failures to produce evidence can deny due process (People v Steadman, 82 NY2d 1, 7 [1993]).
To demonstrate a successful Brady claim under New York law, a defendant must show that "(1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (Giuca, 33 NY3d at 473 [internal quotation marks and citation omitted]).
Evidence that is impeaching in nature includes "benefits conferred on a witness by a prosecutor" because those benefits "provide a basis for the jury to question the veracity of a witness on the theory that the witness may be biased in favor of the People" (People v Colon, 13 NY3d 343, 350 [2009]). It also includes "tacit agreements" (Giuca, 33 NY3d at 474). However, a tacit agreement cannot be based on the witness's "wholly subjective hope of favorable treatment, in the absence of any objective circumstances that reasonably substantiate the witness's expectation" (id. at 475; see also People v Cwikla, 46 NY2d 434, 442 [1979]). Evidence of an impeaching nature additionally includes the prosecutor's assistance in relocation of a murder witness's family, [*9]even though the benefit did not materialize until after the trial (see Colon, 13 NY3d at 348-349).[FN5]
Under New York law, when a defendant makes a specific request for a document, the test of materiality is whether there is a "reasonable possibility" that the undisclosed evidence might have "resulted in a different outcome" (Vilardi, 76 NY2d at 77). Absent a specific request, materiality is established if there is a "reasonable probability" that the result would have been different, i.e., that there is "a probability sufficient to undermine the court's confidence in the outcome of the trial" (Giuca, 33 NY3d at 473-474).[FN6]
The prejudice from suppression of critical impeachment evidence can be compounded by the prosecutor's statements in summation that the witness received no benefit and, therefore, had no motive to lie, while suppressing the very evidence that could provide such a motive (see Colon, 13 NY3d at 346, 350; People v Stein, 10 AD3d 406, 407 [2d Dept 2004], lv denied 4 NY3d 768 [2005]); People v Wallert, 98 AD2d 47, 49 [1st Dept 1983]).
We reject outright the People's argument that we should exercise our "discretionary authority" to dismiss defendants' appeals of the 440 decision because they were deported (see People v Harrison, 27 NY3d 281, 288 [2016]). To the contrary, given the Brady violation at issue, it is important that we retain and decide defendants' permissive CPL 440.10 appeals.
Preliminarily, we agree with the 440 court that defendants suffered no prejudice as a result of the People's failure to disclose that the CVAU sent an application to OVS for reimbursement of L.R.'s medical expenses; that the CVAU assisted L.R. with housing referrals; and that the DA paid L.R. an unknown - but clearly de minimis - amount for lunch ($5.00 per day) and transportation (a Metrocard). The 440 court correctly reasoned that it is highly unlikely that the jury would have believed that L.R. fabricated this crime for the purpose of receiving these benefits.[FN7]
We also agree that the 440 court correctly rejected Flores's argument that his conviction should be vacated because the People violated their Rosario obligations by failing to disclose the CVAU material indicating that the "client expressed his feelings and thoughts" and L.R.'s response to the question on the OVS application, "Tell us about the crime." The statements about L.R.'s feelings are not material statements about the crime. The DA's failure to disclose L.R.'s response to the OVS application, which described the crime as "roommate and friend anally rape[d] victim" did not contribute to the guilty verdict.[FN8]
However, the 440 court erred in holding that the People's suppression of the U visa evidence did not violate Brady. Contrary to the court's finding, the U visa evidence is impeachment evidence under Brady. Relying on People v Giuca, the 440 court reasoned that even if L.R. hoped that he could obtain a U visa in exchange for his cooperation, there was no objective evidence to [*10]reasonably support that hope. The court is correct that under Giuca, a Brady violation cannot be based on "a witness's wholly subjective hope of favorable treatment, in the absence of any objective circumstances that reasonably substantiate the witness's expectation" (33 NY3d at 475). Here, however, the federal statute itself provides the requisite objective circumstances needed to substantiate a complainant's hope that cooperation will result in a U visa certification, and ultimately a U visa.
Although the 440 court correctly pointed out that a prosecutor's certification does not guarantee a U visa, Brady does not require a guarantee (see Cwikla, 46 NY2d at 442 [the People violated Brady by failing to disclose the District Attorney's correspondence with the Parole Board expressing the prosecutor's hope that a testifying witness's "extreme cooperation" in a criminal case would be taken into consideration when the witness became parole eligible]). The DA is not mandated by federal law to issue the certification, but there is no reason to believe that the DA would arbitrarily refuse to issue a certification to a victim of a qualifying crime who assists in a prosecution. It is also of no moment that the prosecutor issued the U visa certification to L.R. after defendants were sentenced. Brady does not require that the benefit materialize in advance of the cooperation (see Colon, 13 NY3d at 348-349 [the People violated Brady by failing to disclose the prosecutor's assistance in relocation of a murder witness's family, even though the housing benefit did not materialize until two months after the trial]).
Turning to whether the U visa evidence was material under Brady, the 440 court correctly applied the reasonable probability standard because defendants did not specifically request the U visa or immigration evidence (see Giuca, 33 NY3d at 473-474). Defendants attempt to justify a lack of a targeted request in their briefs by maintaining that it was not possible for them to have known about the U visa evidence because the CVAU does not list it as a service.
However, the 440 court erred in concluding that there was no reasonable probability that the outcome would have been different had the jury considered the evidence, citing defense counsels' "scathing" cross examinations. Presumably, the court believed that the jury had no doubt about the veracity of L.R.'s accusations because they convicted defendants despite the numerous credibility issues raised on cross-examination. However, we cannot know what a jury would have done with further, material, impeachment arising from the U visa evidence. It might have found the U visa evidence fatally undermined L.R.'s credibility. We find that there is reasonable probability that had the jury considered the U visa evidence, it would have raised enough reasonable doubt to produce a different outcome.
The Court of Appeals has found that there is a reasonable probability that the nondisclosure of critical impeachment [*11]evidence affected the outcome of the trial where the suppressed evidence "would have added a little more doubt to the jury's view of the complainant's allegations" (Hunter, 11 NY3d 1, 6 [2008]; see also People v Wright, 86 NY2d 591, 597 [1995]; Stein, 10 AD3d at 407).
In Hunter, the juryconvicted the defendant of sodomy in the first degree based entirely on the credibility of multiple testifying witnesses where "[t]he forensic evidence was inconclusive" (id. at3). At trial, the defendant testified that he had oral sex with the complainant, but that it was consensual (id.). He explained that at first the complainant welcomed his advances, then told him to stop (which he claimed he did), and then she ran out of the house (id.). The complainant, her friend, and the complainant's mother testified to a different story. The complainant testified that the defendant raped her at his house and performed oral sex (id.). The friend and the mother testified that immediately after the event, the complainant told them what happened (id. at 4). They further testified that the defendant admitted to them that the complainant said "no" during the attack (id.).
Notably, the complainant's own father testified for the defense that she was known in the community as a liar (id.). He also testified that on one occasion his daughter flew into a rage, and, after he threatened to call the police, she responded by saying, "[G]o ahead, call the cops. I will tell them you raped me" (id.). The father testified that he called the police, but the complainant did not follow through on her threat (id.).
After trial, the defendant learned that a man named Parker had been indicted for raping the same complainant 10 months after the defendant's encounter but one month before the defendant's trial (id.). The prosecutor knew about the indictment before the defendant's trial, but he did not disclose it (id.). Parker gave a statement where he admitted to having sex with the complainant, but he maintained that it was consensual (id.). Several months after the defendant's trial, Parker pleaded guilty to attempted rape of the complainant (id.).
In reversing the Appellate Division, the Court of Appeals held that the People violated Brady by suppressing the Parker evidence. The Court of Appeals vacated the conviction and ordered a new trial. In evaluating the reasonable probability of a different outcome, the Court acknowledged that it was "a close question" (id. at 6). The Court reasoned that on the one hand "it would have seemed possible . . . that complainant's accusation of [the defendant] was true, but it would have also seemed possible it was not" (id.).
Nevertheless, the Court of Appeals found that the suppressed evidence was material under Brady. The Court pointed out that although the defendant suggested that ill will between the complainant's mother and the defendant's roommate accounted for the false accusation, "the evidence of this was meager" (id. at 7). The Court also [*12]found that the Parker evidence was not cumulative of the father's testimony because the circumstances differed (id. at 6). Even if the circumstances were similar, the Court reasoned that the Parker evidence "would not be insignificant" because "[a] jury might well find that three actual or threatened allegations of rape raised larger questions about the complainant's credibility than two" (id. at 7). Consequently, the Court of Appeals concluded that the People violated Brady becausethe suppressed evidence "would have added a little more doubt to the jury's view of the complainant's allegations" and it is "reasonably probable that a little more doubt would have been enough" (id. at 6 [emphasis added]).
Applying this analysis here, we find that the People violated Brady because the suppressed U visa evidence would have raised enough reasonable doubt to affect the outcome of the trial. As in Hunter, because defendants' convictions here are entirely dependent on credibility and because the physical evidence is inconclusive, the suppressed U visa evidence "would not be insignificant" (id. at 7).[FN9] Here, the U visa evidence would have allowed the jury to consider a different (and noncumulative) motive to fabricate — one that was based on a personal interest of substantial value as opposed to one based on L.R.'s desire for revenge.[FN10]
Moreover, as was the case in Hunter, the evidence admitted at trial of a motive to fabricate here was "meager" (id. at 6). On cross-examination, L.R. denied that Carrera told him to leave the apartment; denied that he failed to pay rent; and denied that Carrera told him that he drank too much and was too aggressive. Officer Inoa's observation that L.R. and Carrera argued over rent is the only evidence supporting defendants' theory that L.R. fabricated the attack to get revenge. By contrast, the evidence of a motive to fabricate based on the possibility of obtaining a U visa would have been corroborated by the CVAU file. Thus, as in Hunter, the People here violated Brady.
In holding that the People violated Brady, we also consider that, logically, the suppression of critical impeachment evidence has more impact in a case dependent on credibility alone because the evidence of guilt does not rest on any other evidence (see People v Ulett, 33 NY3d 512, 520 [2019]). Here, the prejudicial impact cannot be understated, especially where the jury already had before it evidence tending to undermine L.R.'s credibility. That prejudice was further exacerbated by the prosecutor's repeated statements on summation that L.R. had "no motive" to lie and, that L.R. "received no benefits from making up these allegations" while suppressing the very evidence that could provide such a motive (see Colon, 13 NY3d at 346, 350; Stein, 10 AD3d at 407; Wallert, 98 AD2d at 49).
Accordingly, the order of the Supreme Court, Bronx County (John W. Carter, J.), entered on or about March 26, 2021, which denied each defendant's CPL 440.10 motion to vacate [*13]judgment, should be reversed, on the law, the judgments vacated, and the indictments dismissed under CPL 440.10(4), and as a matter of discretion in the interest of justice, and the appeals from the judgments, same court and Justice, rendered December 17, 2015, convicting each defendant, after a jury trial, of criminal sexual act in the first degree, assault in the third degree and criminal possession of a weapon in the fourth degree, and sentencing each defendant to an aggregate term of eight years, should be dismissed as academic.
Order, Supreme Court, Bronx County (John W. Carter, J.), entered on or about March 26, 2021, reversed, on the law, the judgments vacated, and the indictments dismissed under CPL 440.10(4) as a matter of discretion in the interest of justice. The appeals from the judgments, same court and Justice, rendered December 17, 2015, convicting each defendant, after a jury trial, of criminal sexual act in the first degree, assault in the third degree and criminal possession of a weapon in the fourth degree, and sentencing each defendant to an aggregate term of eight years, are dismissed as academic.
Opinion by Moulton, J. All concur.
Kapnick, J.P., Kern, Gesmer, Singh, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 23, 2023

Footnotes

Footnote 1:The weapons charge was based on defendants' possession and use of kitchen objects. The indictment alleges that "defendants, acting in concert with each other, on or about December 24, 2013, in the county of the Bronx, did possess various kitchen objects with intent to use the same unlawfully against another."

Footnote 2:According to hospital records attached to defendant Carrera's 440 motion as Exhibit G, L.R. "reported that he left the building screaming and on the way out one of the assailants [sic] wife stopped in at the door and begged him no[t] to call the police . . . . [L.R.] reported he also saw one of the women cleaning the lobby floor with clorox [sic]. Pt states that a good samaritan [sic] called the police for him while he was screaming for help." These documents were not entered into evidence at trial.
Footnote 3:Officer Inoa's file did not contain any photographs of L.R.'s bruises. The prosecution never produced any photographs of L.R.'s bruises at trial.
Footnote 4:Flores turned himself in to the police after he heard that they were looking for him.

Footnote 5:Colon indicates, without further explanation, that the prosecutor assisted in the relocation of the witness's grandparents by "contacting" the New York City Housing Authority (13 NY3d at 348). Presumably, that contact involved the prosecutor certifying that the witness cooperated with the prosecution, similar to a U visa certification (see The New York City Housing Authority Tenant Section and Assignment Plan, available at https://www.nyc.gov/assets/nycha/downloads/pdf/TSAPlan.pdf [applicants who have a family member cooperating in a criminal investigation or prosecution are assigned a priority if law enforcement certifies, among other things, that a threat was made "in retaliation for past or present cooperation with the prosecutorial or police agency"] [last accessed May 19, 2023]).
Footnote 6:Under federal law, the materiality standard for all alleged Brady violations is the reasonable probability standard (see Kyles v Whitley, 514 US 419, 434 [1995]).
Footnote 7:Defendants recently learned that OVS paid for L.R.'s medical expenses. After oral argument in this appeal, the People realized that it had produced certain redacted FOIL responses which did not reflect that OVS paid for L.R.'s medical bills (which were primarily related to mental health services). By letter dated March 8, 2023, the DA provided this Court and the defense with the relevant unredacted responses. Defendants responded by letter dated March 9, 2023, decrying the late disclosure, and asserting prosecutor malfeasance. That prompted the DA to reply by letter dated March 17, 2023. Admitting the error, the DA asserted that "these disclosure errors were not intentional" and that "CVAU's efforts to assist the victim should have been disclosed at trial." Nevertheless, the DA argued, as it did on appeal, that disclosure of this evidence would not have changed the verdict, a point with which we agree. However, the belated disclosure of this evidence, like the DA's prior belated disclosures, is troubling.
Footnote 8:We decline to reach Carrera's argument that his conviction should be vacated based on newly discovered evidence. The argument is buried in a footnote that was overlooked by the People and, in any event, is academic.

Footnote 9:The December 31, 2013 Montefiore hospital emergency room records refer to "minimum bruising." However, the source of that bruising is still dependent on L.R.'s credibility.
Footnote 10:The People's argument, that disclosure of the U visa evidence would not have mattered because L.R. accused defendants of attacking him long before he sought a U visa, is unpersuasive. The U visa evidence is mentioned for the first time in the CVAU records a little over nine months after L.R. reported the attack and ten months before trial. However, it is certainly possible that L.R. knew about the U visa earlier, especially considering that the Director of the CVAU stated in paragraph 14 of her affirmation that "[u]ndocumented clients are usually aware of the existence of U-visas." In any event, even if the possibility of obtaining a U visa was not L.R.'s original motive for reporting the crime, a jury could find that it provided a continuing motive to lie.